1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11    ANTHONY DENARD,                          No. C 08-04887 JW (PR)

12              Petitioner,                     **ORDER DENYING PETITION FOR
                                                WRIT OF HABEAS CORPUS;**
13         v.                                   **DENYING CERTIFICATE OF
                                                APPEALABILITY**
14
      D.K. SISTO, Warden,
15
                Respondent.
16
      _____/
17

18                              **I. INTRODUCTION**

19         This matter is now before the Court for consideration of Anthony Denard's

20    ("Petitioner") <u>pro se</u> Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254[1] concerning

21    his 2006 conviction in Alameda County Superior Court.  For the reasons set forth below, the

22    Petition is DENIED as to all claims.  In addition, no certificate of appealability will be

23    issued.

24                               **II. BACKGROUND**

25    **A.     Facts**

26         In an unpublished opinion addressing Petitioner's claims on direct appeal, the

27    ──────────────────

28    [1] (Petition for Writ of Habeas Corpus, hereafter, "Petition," Docket Item No. 1.)

Order Denying Petition
C:\Users\noblew\AppData\Local\Temp\fz3temp-1\Denard4887_denyHC.wpd

**United States District Court**
For the Northern District of California

California Court of Appeal set forth the following summary of the facts:

> It is undisputed that defendant shot and killed Kevin Davis in the early morning of May 12, 2000; the issues at trial were whether he committed murder, manslaughter by acting in unreasonable self-defense, or no crime by acting in reasonable self-defense.

> On the night of May 11-12, 2000, Davis lost money to defendant's friend Jordan Robinson in an Oakland establishment witnesses called the "gambling shack"- a Senior Citizens Club with craps tables in the back room. Davis went to the gambling shack that night with his girlfriend, Lakeisha Parker, lost $1,000 playing dice, went to Parker's home to get an additional $2,500 she was keeping for him, and returned to the shack with Parker, Jazzlynn Samuel, and Valerie Long to continue gambling. Defendant and Robinson arrived later, allegedly with a third individual, Dameion Thomas; they were subsequently joined by defendant's friend Lashanelle Garrett. Defendant and his friends had not met Davis and his friends before that night. The prosecution presented testimony from Parker, Samuel, Long, and Garrett; defendant, Robinson, and Thomas testified for the defense.

> Parker could not be located to testify, and her testimony from the prior trial was read into the record. Parker said that Davis exchanged mean and aggressive words with Robinson and defendant while Davis and Robinson gambled one-on-one at the shack. Robinson testified that during the gambling, after he had won a substantial sum from Davis, Davis put a gun on the table and said he could "take his money back any time he'd like." Parker said that Davis had no weapon that night, and she, Samuel, and Long denied that Davis made any threats in the shack.

> Robinson said that defendant left the shack with Garrett before Davis displayed the gun. Defendant testified that, as he was leaving, Davis stepped in front of him and said, "'[S]hould I let you leave? . . . I got something in the trunk of my car to make you limp for the rest of your life.'" Thomas corroborated defendant's account of the threat, but Parker denied that Davis said anything when defendant left the shack. Samuel heard defendant tell Robinson, "'I'll be back'" as he was leaving; defendant denied saying this. Thomas testified that defendant said, "'We'll talk to you later.'"

> Defendant asked Garrett to drive him to his parents' house; he said that he planned to change clothes and go to his girlfriend's house, but Robinson telephoned him while he was changing and told him "to come on up there." Defendant said it was "a panic call," and he could tell from the tone of Robinson's voice that something was wrong. Robinson said he called defendant for help because he was afraid after Davis displayed the gun. Robinson said he did not tell defendant about Davis's gun, and there was no reason why defendant should have returned to the shack with a gun.

> After the call from Robinson, defendant got a loaded gun from under his bed, and told Garrett to drive back to the shack. Garrett testified that defendant was calm as she drove the 30 blocks to the shack, and calm when he asked her to take the gun after they arrived there. He handed her the gun as they walked to the shack and she put it in her pants. Defendant was frisked at the door of the shack, where Davis ran into him as he was leaving with Parker, Samuel, and Long.

The ensuing altercation was described in the testimony as follows:

Parker said that defendant and Davis exchanged a few words and pushed and shoved each other briefly. Defendant ran to Garrett and Davis started arguing with Robinson, who had come out of the shack. Davis and Robinson argued for two or three seconds, standing close together. Defendant took the gun from Garrett, and Robinson told defendant, "'Stop, no, don't shoot.'" Defendant first shot Davis when Davis was facing Robinson, with his back to defendant. After he was shot, Davis turned and walked toward defendant and said, "'Are you going to shoot me?'" Defendant walked up to Davis and kept shooting until he was out of bullets. He fired at least three shots after Davis fell to the ground, and then beat Davis in the head with the gun before running away.

Samuel said that she got around the commotion at the entrance of the gambling shack, and started walking down the block toward Davis's car. When she looked back, she saw Davis and defendant arguing; she did not see any hitting or shoving. She ran when she saw defendant unzip Garrett's coat and then heard gunshots. After one or two shots she heard Davis say, "'Are you going to shoot me?'" and then heard four or six more shots. At some point she heard a male voice say, "No, don't do it."

Long said that Davis and defendant argued, but she kept walking to the car. She heard someone, likely Robinson, yell "No" before shots were fired. She heard the shots, but did not see who fired them. After she heard the shots, she ran down the street with Samuel.

Gabriela Cruz, who lived near the gambling shack, called 9-1-1 when she heard shots that morning. She looked outside and saw a man lying in the street. Before the shots, she heard several people saying, "No, no, no."

Laron Caesar, an acquaintance of Davis's, was standing outside a club near the gambling shack around 4:00 a.m. when he heard a rapid burst of four or five shots and saw people running. Twenty seconds to one minute later he heard people saying, "still being hit," and he saw a black male hitting a person on the sidewalk by the shack with what he presumed was a gun. The victim was curled up on the ground trying to block the blows; the victim was helpless and Caesar saw him being hit two to six times. When Caesar walked over two or three minutes later, he saw a woman turn the victim over onto his back, and recognized the victim as Davis.

Robinson said he heard a commotion at the front door of the gambling shack after Davis left the craps table, ran outside, and saw that defendant and Davis had bumped into each other. Robinson said that Davis immediately "ran up in my face . . . basically saying it be the last time he could get his money back." Davis came within an arm's length of him, but did not touch him, and had no weapon. When Robinson backed away, Davis turned his attention to defendant. By that point Robinson was in the street, walking to his car, saying, "Come on, you all, let's go." Robinson saw Davis get "in [defendant's] face"; they were "trash talking," but had no weapons, and exchanged no blows or death threats. Robinson turned his back, went quickly to his car, and heard shots as he was getting into the car and driving away with Thomas.

Thomas said that when he came out of the shack he saw defendant run behind a car, and saw Davis run up to Robinson "[l]ike he was going to beat him up." Davis had his back to the street when he argued with Robinson and talked

about getting his money back; Davis was gesturing but had nothing in his hands. When Robinson moved to the side, Davis turned around and walked or ran to defendant, who was returning to the sidewalk. Davis poked defendant in the forehead, and defendant responded by shooting Davis in the chest. Thomas ran to Robinson's car and rode away with him.

Defendant said that after he was frisked at the door to the gambling shack Davis approached him and said, "You went and got a gun," and he "told him I didn't." Davis poked him in the forehead and pushed him in the chest backward into Garrett, saying he was going to "whop my ass, punk bitch"; he tried to avoid Davis and told him to get his hands out of his face. Davis poked him in the eye and defendant ran away, but stopped when he heard Davis and Robinson arguing. Davis was facing Robinson with his hands in Robinson's face telling Robinson that he would "whop his ass." Defendant walked back and yelled "Let's go," which got Davis's attention. Davis turned, repeated that he would "whop my ass," "dropped his hand like he was reaching," and "charge[d]" at him.

Defendant said he ran to Garrett, turning his back on Davis, and grabbed the gun from her. When he spun around, Davis was six to eight feet away, advancing toward him. He did not look at Davis's hands and did not know if Davis had a gun, but he thought that Davis was armed because of the gesture Davis made-"[l]ike he was going up under his shirt to grab something"-before charging him. He closed his eyes and, as he was backing away, shot six times in Davis's direction. He did not mean to kill Davis. He fired the shots because he feared for his life, and kept shooting because he did not know whether Davis had been hit. After the shots were fired, he ran to the car and drove away with Garrett.

Davis was alive when police reached the scene, but died later that day. Dr. Thomas Rogers performed the autopsy and identified the cause of death as multiple gunshot wounds. The autopsy showed that Davis was struck by six bullets: two in the left side of the abdomen, two in the upper left arm, one in the left calf, and one in the buttock. Ballistics expert Lansing Lee opined that one of the shots to Davis's arm was fired from less than an inch away.

Rogers testified that the shots to the abdomen and the arm entered in the front of the body; the shot to the leg, like that to the buttock, entered from behind. The shot to the leg entered near the calf muscle, traveled in an upward trajectory, and exited through the knee. The shot to the buttock also traveled upward and lodged in the lower part of the spinal cord. Rogers could not rule out the possibility that someone could have run after being shot in the leg like Davis, but said that the shot into the buttock and spinal cord would have incapacitated the victim's legs. Defendant denied shooting Davis in the back. Rogers said that Davis could not have been running upright toward the shooter when he was shot in the leg and buttock, but Rogers did not know the sequence in which the shots were fired, and acknowledged that being struck by a bullet could cause the body to move.

Defendant said that he gave the gun to his cousin, who discarded it in the marina. When Oakland Police Officer Marcus Midyett talked to defendant on May 30, 2000, defendant falsely identified himself as Michael Denard. Defendant testified that he gave a false name because he had a warrant for a traffic offense. Defendant worked for the Oakland Boys and Girls Club at the time of the incident. He had been drafted to play professional baseball, and had

4

**United States District Court**
For the Northern District of California

signed a contract to play for a team in Evansville, Indiana, beginning in June 2000. Instead of reporting to the team, defendant and Garrett went to Oklahoma that month, where they stayed with defendant's brother and his wife. Defendant testified that he went to Oklahoma at his parents' request because his brother was having problems in school; at his first trial, defendant said that he did not go to Indiana to play baseball because he did not want to be pulled off the field in handcuffs. He was arrested at his parents' house in July 2000, after returning from Oklahoma, for the murder of Davis.

Parker was taken to a patrol car at the scene on May 12, 2000, and agreed to be taken to the police station. When she was initially interviewed, she denied seeing who shot Davis, but after a break in the questioning she identified defendant as the shooter.

In his statements to the police after his arrest, defendant initially denied, but eventually admitted, shooting Davis. He did not mention in the statements that Thomas was with him at the gambling shack. He did not say in his taped statement that Davis blocked his path when he left the shack, or that Davis said he had something that would make him limp for the rest of his life. He did not initially tell police that he received a call from Robinson when he was at his parents' house; he mentioned the call only after being told that his claim of self-defense was making no sense. When he recounted the call, he did not say that Robinson asked him to return to the shack; he said Robinson "was, like, I'm getting ready to leave. And I was like all right. And I was like I'm going to come back up there. So I went. I went on my way back up there.'" He did not tell police that Davis reached under his shirt before he charged at him. He told police that he was looking right at Davis when he shot him. Before testifying at his second trial, he never said that he had his eyes closed when he fired the shots.

Parker had been convicted of selling a controlled substance (Health & Saf. Code, § 11352), Robinson of possession of a controlled substance with intent to distribute (21 U.S.C. § 841).

Davis was 25 years old and defendant was 22 when the shooting occurred.

People v. Denard, No. A113031, California Court of Appeal, First Appellate District (Sept. 11, 2007) (Answer to Petition, Ex. E) at 2-7.[2]

**B.   Case History**

    In 2001, as a result of the above incident, Petitioner was convicted of second degree murder with the use of a firearm and was sentenced to forty years in state prison. In 2002, the California Court of Appeal reversed the conviction because of instructional error.

    In 2005, Petitioner was retried on the murder charge (Cal. Penal Code § 187(a)) and on allegations that he personally and intentionally discharged a firearm (Cal. Penal Code

---

[2] Hereafter, all referenced exhibits are those lodged by Respondent in support of the Answer to the Petition, hereafter, "Answer," Docket Item No. 10, unless otherwise noted.

§§ 12022.5(a), 12022.53(c), (d)).   (Ex. A at 64-65.)   The jury found Petitioner guilty of second degree murder and found true the weapons enhancements.   (Ex. A at 231-33; Ex. B at 1346-47).   He was sentenced to forty years-to-life in state prison.   (Ex. A at 241-42; Ex. B at 1355-56.)

On January 27, 2006, Petitioner timely appealed.   (Ex. B at 246.)   On September 11, 2007, the California Court of Appeal affirmed the judgment.   (Ex. E.)   On December 12, 2007, the California Supreme Court denied Petitioner's petition for review, without comment.   (Ex. G.)

On October 27, 2008, Petitioner filed the instant Petition.   On March 23, 2009, Judge Walker issued an Order to Show Cause; thereafter, Respondent filed an Answer to the Petition and Petitioner filed a Traverse.

On March 2, 2011, the case was reassigned to the undersigned.

### III. STANDARDS

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d).   The first prong applies both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations.   Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" clearly established Supreme Court precedent if

it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340.

Where constitutional error is found, habeas relief is warranted only if the error at issue had a "substantial and injurious effect on the verdict." Penry v. Johnson, 532 U.S. 782, 796 (2001) (citation omitted).

In determining whether the state court's decision is contrary to or involved an unreasonable application of clearly established federal law, or is based on an unreasonable determination of the facts, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claims in a reasoned decision. LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir. 2000). Here, the California Court of Appeal was the highest court to address Petitioner's claims in a reasoned opinion. Thus, it is that opinion which the Court reviews when ruling on Petitioner's claims.

## IV. DISCUSSION

Petitioner raises the following three claims for habeas corpus relief: (1) his right to due process was violated by the trial court's failure to instruct the jury sua sponte on the lesser-included offense of imperfect self-defense of others; (2) his right to due process was violated by the trial court's failure to instruct the jury properly on the definition of imperfect

1  self-defense; and (3) his rights to due process and freedom from the application of ex post

2  facto laws were violated when the trial court instructed the jury with a definition of

3  manslaughter that was adopted after the crime was committed. [3]

4  **A.    <u>Failure to Instruct on Lesser-Included Offense</u>**

5         Petitioner contends the trial court violated his right to due process by failing to instruct

6  the jury <u>sua</u> <u>sponte</u> on voluntary manslaughter based on a theory of imperfect self-defense of

7  others.  (Pet. at 6A.)  Specifically, he maintains that such an instruction was required because

8  "defense counsel needed to justify, or at least mitigate" the evidence that Petitioner shot

9  Davis from behind.  (<u>Id.</u>)

10        The California Court of Appeal rejected Petitioner's argument, reasoning as follows:

11        "[O]ne who kills in the actual but unreasonable belief that he must protect
          another person from imminent danger of death or great bodily injury is guilty
12        of voluntary manslaughter, and not murder."  (<u>People v. Randle</u> (2005) 35
          Cal.4th 987, 990 (<u>Randle</u>); <u>see also</u> <u>People v. Barton</u> (1995) 12 Cal.4th 186,
13        199 [killing in unreasonable self-defense constitutes a form of voluntary
          manslaughter and is a lesser included offense of murder].)  The court has a duty
14        to instruct sua sponte on a lesser included offense "whenever evidence that the
          defendant is guilty only of the lesser offense is "substantial enough to merit
15        consideration" by the jury."  (<u>People v. Breverman</u> (1998) 19 Cal.4th 142, 162
          (<u>Breverman</u>).)  "'Substantial evidence' in this context is "evidence from which
16        a jury composed of reasonable [persons] could . . . conclude [ ]' 'that the lesser
          offense, but not the greater, was committed.'"  (<u>Ibid.</u>)  We find no substantial
17        evidence here that required an instruction on imperfect defense of another.

18        Defendant could have been found to have acted in defense of Robinson only if
          he actually believed (1) that Robinson was in imminent danger of being killed
19        or suffering great bodily injury, and (2) that the immediate use of deadly force
          was necessary to defend against the danger (CALCRIM No. 571.)  For a
20        number of reasons, it could not be reasonably inferred from the evidence in this
          case that defendant actually had either of these beliefs, as we now explain

21
          First, while we recognize that a lesser included offense instruction may be
22        required even in the face of contrary defense evidence (<u>Breverman</u>, <u>supra</u>, 19
          Cal.4th at p. 163), it is at least relevant that defendant never claimed to have
23        had either of these beliefs, or to have acted out of concern for Robinson.
          Indeed, he denied shooting Davis while Davis argued with Robinson.

24

25  _____

26        [3] The petition also includes a claim alleging the violation of Petitioner's Sixth
    Amendment right to confront witnesses, which Respondent has moved to dismiss as
27  unexhausted.  Petitioner concedes the claim is unexhausted and seeks to withdraw the claim.
    Petitioner's request is GRANTED; the claim is withdrawn and the Court proceeds to discuss
28  the three remaining claims.

United States District Court
For the Northern District of California

Second, while we must, for purposes of defendant's contention, credit Parker's testimony that defendant shot Davis once while Davis was confronting Robinson, all witnesses agreed that Davis and Robinson merely exchanged words, did not touch each other, and held no weapons  Insofar at it appears from the evidence, their argument was brief These circumstances contrast sharply with those in the reported cases, where the victims had inflicted physical injury before they were killed (See Randle, supra, 35 Cal.4th at pp. 991-992 [imperfect defense of another instruction was justified where victim was beating defendant's cousin]; People v. Anderson (2006) 141 Cal. App. 4th 430, 447 [instruction was warranted where victim had cut defendant's friend with a crack pipe].)  Defendant cites no authority suggesting that a brief verbal confrontation would support the instruction at issue

Third, it is not apparent that Robinson needed defendant's help to protect himself from Davis Defendant did not see the gun Davis allegedly displayed in the shack, Robinson did not mention the gun when he called defendant, and, although Davis told defendant he had something that could make him limp for life, he said the implement was in his car, not on his person Thus, defendant had no reason to think it likely that Davis was armed when he was arguing with Robinson There is no evidence that Davis had cornered Robinson To the contrary, Robinson and Thomas testified that Robinson was able to avoid Davis simply by moving away from him Parker said that Robinson told defendant "Stop, no, don't shoot" before the shot was fired-testimony that was corroborated to some extent by Samuel, Long, and Cruz, and not refuted by any defense witness

For these reasons, it would be entirely speculative to infer that defendant was trying to protect Robinson when he first shot Davis Where, as here, "it is doubtful that . . . defendant believed, reasonably or unreasonably, that any threatened danger to [the victim] was 'imminent,'" an instruction on unreasonable defense of another is not required (People v. Michaels (2002) 28 Cal.4th 486, 531.)

(Ex. E at 7-9.)

In Beck v. Alabama, 447 U.S. 625, 638 (1980), the United States Supreme Court held that a trial court's failure to instruct on a lesser-included offense in a capital case amounts to constitutional error if there was evidence to support the instruction.  However, the Supreme Court has not decided whether this rationale extends to non-capital cases.  See Turner v. Marshall, 63 F.3d 807, 818 (9th Cir. 1995), overruled on other grounds by Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999).  If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law.  Carey v. Musladin, 549 U.S. 70, 77 (2006).  Here, because there is no clearly established federal law requiring a state trial court to instruct on lesser-included offenses in non-capital cases, this Court cannot find,

United States District Court

For the Northern District of California

1    as a matter of law, that the state appellate court's rejection of Petitioner's claim was

2    unreasonable.  See id. ("Given the lack of holdings from [the United States Supreme] Court

3    regarding [petitioner's claim], it cannot be said that the state court unreasonably applied

4    clearly established Federal law.") (quotation and citation omitted); Ponce v. Felker, 606 F.3d

5    596, 604 (9th Cir. 2010) ("If Supreme Court cases 'give no clear answer to the question

6    presented,' the state court's decision cannot be an unreasonable application of clearly

7    established federal law.") (citation omitted)).

8         Even though the failure of a state trial court to instruct on a lesser-included offense in

9    a  non-capital case does not present a federal constitutional question, "the defendant's right to

10   adequate jury instructions on his or her theory of the case might, in some cases, constitute an

11   exception to the general rule."  See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).  Solis

12   suggests that in order for this exception to apply there must be substantial evidence to

13   warrant the instruction on the lesser-included offense.  See id. at 929-30 (finding no duty to

14   instruct on lesser-included offense of voluntary manslaughter where evidence precluded heat

15   of passion or imperfect self-defense instruction, or lesser-included offense of involuntary

16   manslaughter where evidence implied malice).

17        In the present case, the evidence adduced at trial did not warrant an instruction on

18   voluntary manslaughter based on a theory of imperfect defense of others.  Petitioner could

19   have been found to have acted in defense of Robinson only if he actually believed (1) that

20   Robinson was in imminent danger of being killed or suffering great bodily injury, and

21   (2) that the immediate use of deadly force was necessary to defend against that danger.  As

22   the Court of Appeal discussed, however, there was not substantial evidence from which it

23   reasonably could be inferred that Petitioner had either of these beliefs.  Specifically,

24   Petitioner never claimed to have had either of these beliefs, or to have acted out of concern

25   for Robinson; he denied shooting Davis while Davis argued with Robinson; all witnesses

26   agreed that Davis and Robinson merely exchanged words in a brief argument, did not touch

27   each other, and held no weapons; and, it was not apparent that Robinson needed Petitioner's

28   help to protect himself from Davis.  Consequently, the Court of Appeal concluded, based on

10

1   such evidence, it would be entirely speculative to infer that Petitioner was trying to protect

2   Robinson when he first shot Davis.  (Ex. E at 9.)

3          Further, the Court of Appeal noted that because Petitioner shot Davis five more times

4   after any need to protect Robinson ended, any partial justification for the first shot could have

5   lessened his culpability only if that shot, alone, amounted to deadly force.  The record,

6   however, did not support that conclusion:

7          Dr. Rogers testified that one of the two shots to Davis's back, the one into the
           buttock that lodged in the spinal cord, would likely have incapacitated Davis's
8          legs, but Davis apparently stayed on his feet after the first shot. It thus appears
           that the first shot was the one that passed through Davis's leg - the one Rogers
9          said would not necessarily have prevented him from running - and there is no
           evidence that that shot alone would likely have been fatal.  Nor did Rogers's
10         testimony suggest that the five additional shots would have been insufficient to
           kill Davis.

11  (Ex. E at 9-10.)

12         Thus, because the state court reasonably concluded that there was not substantial

13  evidence that the immediate use of deadly force was necessary to protect Robinson from

14  Davis, instruction on the lesser-included offense of imperfect defense of others was not

15  required.

16         Finally, even if the trial court erred by not giving the instruction, such error was not

17  prejudicial because it is not likely the jury would have come to a different verdict based on

18  the evidence presented.  Rather, as discussed by the Court of Appeal, it was not reasonably

19  probable that a different result would have been reached if the instruction had been given

20  because, based on the evidence discussed above, "the jury would likely have found that a

21  shot to Davis during the argument with Robinson was intended simply to hurt Davis, not to

22  help Robinson."  (Ex. E. at 10.)

23         For the foregoing reasons, the Court finds that the state court's rejection of

24  Petitioner's claim was not contrary to or an unreasonable application of clearly established

25  Supreme Court precedent, or based on an unreasonable determination of the facts in light of

26  the evidence presented at trial.  Accordingly, Petitioner is not entitled to habeas relief on this

27  claim.

28

United States District Court

For the Northern District of California

**B.**     <u>Erroneous Imperfect Self-Defense Instruction</u>

Petitioner next challenges the trial court's instruction on the right of imperfect self-defense under CALJIC No. 5.17.  (Pet. at 6B-6D).  Specifically, he claims the trial court erred when it truncated the instruction, thereby allowing the jury to find (1) that the right of imperfect self-defense was unavailable if Petitioner created the circumstances causing the victim to attack him, and (2) that the victim was required to attack, rather than simply to pursue, Petitioner.  (Pet. at 6B-6C.)

The California Court of Appeal rejected both of these claims, reasoning as follows:

The court instructed the jury on imperfect self-defense pursuant to CALJIC No. 5.17 as follows: "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder.  This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief.  Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter.  [¶]  As used in this instruction, an "imminent" peril or danger means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer.  [¶]  However, this principle is not available, and malice aforethought is not negated, if the defendant by his conduct created the circumstances which legally justified his adversary's attack."

Defendant contends that the court erred by omitting the following bracketed language from the last paragraph of the instruction: "However, this principle is not available, and malice aforethought is not negated, if the defendant by his [unlawful or wrongful] conduct created the circumstances which legally justified his adversary's [use of force, attack or pursuit]."

Defendant reasons that the jury should have had the opportunity to consider whether he lawfully shot Davis in defense of Robinson before Davis turned around and charged at him, and thus potentially find that the principle of imperfect self-defense was not negated by wrongful provocation of Davis.  However, the evidence did not support an instruction on lawful defense of another; as we have explained, the evidence did not even support an instruction on imperfect defense of another.  As defendant himself concedes at one point in his briefing, "[t]he fact that there was only a verbal confrontation between Davis and Robinson would probably disprove the right to shoot in complete defense of others."  Moreover, as the People note, defendant's "possession, transportation, and concealment of the loaded .38 caliber pistol" he used to shoot Davis "was indisputably wrongful and/or unlawful."  Accordingly, the court did not err in omitting the words "unlawful or wrongful" from CALJIC No. 5.17, and there is no prospect that defendant could have been prejudiced by the omission in any event.

Defendant contends that the court should have added the words "or pursue" to the last paragraph of CALJIC No. 5.17 because the jury could have been misled by the omission into thinking that he could not claim imperfect self-defense

12

1
2
3
4
5
6
7

because he had not yet been physically attacked by Davis when he shot him. The record did not support a pursuit instruction because there is no evidence that defendant attempted to flee from Davis when Davis charged him. (See Black's Law Dict. (8th ed. 2004) p. 1272, col. 1 ["pursuit" refers to the "act of chasing to overtake or apprehend"]; Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 947, col. 2 ["pursue" means "to follow in order to overtake, capture, kill, or defeat"].) The balance of CALJIC No. 5.17 made it clear in any event that unreasonable self-defense can be based on a belief in "imminent peril" before an actual attack. Thus, there is no reasonable possibility that the jury could have misunderstood the concept of imperfect self-defense in the manner defendant posits.

(Ex. E at 10-12.)

8
9
10
11
12
13
14
15
16
17

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991); see also 28 U.S.C. § 2254(a). A petitioner is not entitled to habeas relief based on alleged error in the interpretation or application of state law. See Estelle, 502 at 68; Dugger v. Adams, 489 U.S. 401, 409 (1989) ("The availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution."). Thus, to the extent Petitioner contends the version of CALJIC No. 5.17 given to the jury was incorrect under California law, this ground for relief is not cognizable on federal habeas review. See Estelle, 502 U.S. at 71-72.

18
19
20
21
22
23
24
25
26

To obtain federal collateral relief for alleged error in the jury charge, a federal habeas petitioner must show that the entire trial was so infected by the error that the resulting conviction violates due process. See id. at 72. The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. In reviewing an ambiguous instruction, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. See id. at 72 & n.4. The defined category of infractions that violate fundamental fairness is very narrow. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." Id. at 73.

27
28

Under California law, "[i]t is well established that the ordinary self-defense doctrine -- applicable when a defendant reasonably believes that his safety is endangered -- may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a

United States District Court
For the Northern District of California

13

United States District Court

For the Northern District of California

1    physical assault or the commission of a felony), has created circumstances under which his

2    adversary's attack or pursuit is legally justified.  [Citations.]  It follows, a fortiori, that the

3    imperfect self-defense doctrine cannot be invoked in such circumstances."  In re Christian S.,

4    7 Cal.4th 768, 773 (1994).  Here, viewing the challenged instruction in the context of the

5    instructions as a whole and the trial record, the Court finds, for the reasons discussed below,

6    that the version of CALJIC No. 5.17 given by the trial court did not improperly dilute the

7    imperfect self-defense instruction in violation of due process.

8          Petitioner's first argument is that the instruction as given did not provide the jury with

9    the opportunity to consider whether, before Davis turned and charged at Petitioner, Petitioner

10   lawfully shot Davis in defense of Robinson, and, thus, potentially to find that the principle of

11   imperfect self-defense was not negated by Petitioner's wrongful provocation of Davis.  As

12   discussed above, however, there was no evidence that when Petitioner first shot Davis he was

13   acting in defense of another.

14         Additionally, the Court of Appeal found, and Petitioner does not dispute, that

15   Petitioner engaged in unlawful and/or wrongful conduct when he possessed, transported and

16   concealed a loaded .38 caliber pistol, thereby creating the circumstances that led him to use a

17   gun to shoot Davis in the back of the leg, causing Davis to turn and charge at him in self-

18   defense.

19         Accordingly, because the evidence did not support a finding that Petitioner's creation

20   of the circumstances which led to Davis's provocation was lawful, the Court finds that he

21   was not prejudiced by the trial court's omission of the phrase "unlawful or wrongful" from

22   the jury instruction.

23         Petitioner's second argument is that omission of the words "or pursue" from the end

24   of the instruction "wrongly cause[d] the jury to believe that imperfect self-defense was not

25   available if Davis merely 'pursu[ed]' appellant.  Instead, Davis needed actually to 'attack'

26   appellant."  (Pet. at 6D.)  As the state court reasonably found, however, there was no support

27   in the record for a pursuit instruction because there was no evidence that Petitioner tried to

28   flee from Davis when Davis came toward him.  (Ex. E at 12.)  Further, the instruction as

14

given allowed the jury potentially to find that Petitioner acted in imperfect self-defense based on his actual, but unreasonable, belief that he was in "imminent peril" before any actual attack by Davis.  (Ex. E at 12.)

Based on the above, the Court concludes that the trial court's instruction allowed the jury to consider Petitioner's theory of imperfect self-defense and, as found by the Court of Appeal, that there was "no reasonable possibility that the jury could have misunderstood the concept of imperfect self-defense in the manner [Petitioner] posits."  (Ex. E at 12.) Accordingly, as Petitioner has not shown that the jury applied CALJIC No. 5.17 in a way that violates the Constitution, or that the alleged omissions had a substantial and injurious effect or influence in determining the jury's verdict, he is not entitled to habeas relief on this claim.

**C.     Erroneous Manslaughter Instruction**

In his final challenge, Petitioner argues that the trial court's instruction on the defense of manslaughter under CALJIC No. 8.40 violated the due process and ex post facto clauses because it was based on definitions of crimes adopted after he killed Davis.  (Pet. at 6D-6E.) Specifically, he argues that the instruction expanded the definitions of voluntary manslaughter and involuntary manslaughter, despite those definitions applying prospectively only.  (Id.).

The California Court of Appeal agreed that there was instructional error, but found that Petitioner was not prejudiced thereby, reasoning as follows:

> Under People v. Blakeley (2000) 23 Cal.4th 82, 85, 91 (Blakeley), an unintentional killing, with conscious disregard for life, in unreasonable self-defense, constitutes voluntary manslaughter, but this rule does not apply before June 2, 2000, when Blakeley was decided.  Here, the killing occurred on May 12, 2000.  Thus, defendant's jury should have been instructed "that unintentional killing in unreasonable self-defense is involuntary manslaughter." (People v. Johnson (2002) 98 Cal. App. 4th 566, 577.)  Instead, the jury was instructed under CALJIC No. 8.40 that an unintentional killing, with implied malice, in unreasonable self-defense, is voluntary manslaughter. [FN1] CALJIC No. 8.40 stated in pertinent part: "Every person who unlawfully kills another human being without malice aforethought but either with an intent to kill, or with conscious disregard for human life, is guilty of voluntary manslaughter in violation of Penal Code section 192, subdivision (a). [&] There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion or in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury."
>
> FN1.  Apart from CALJIC No. 8.40, the jury was given a panoply of

United States District Court

For the Northern District of California

correct standard instructions on murder and manslaughter, including CALJIC Nos. 8.00 (Homicide-Defined), 8.10 (Murder-Defined), 8.11 ("Malice Aforethought"-Defined), 8.30 (Unpremeditated Murder of the Second Degree), 8.31 (Second Degree Murder-Killing Resulting From Unlawful Act Dangerous to Life), 8.37 (Manslaughter-Defined), and 8.50 (Murder and Manslaughter Distinguished).

The error is of no avail to defendant, however, because the jury necessarily resolved the issue of imperfect self-defense against him under other properly given instructions. (People v. Lewis (2001) 25 Cal.4th 610, 646.) As we have indicated, defendant's challenges to the self-defense instructions in this case, and his claim that defense of another instructions were required, lack merit. Under the other proper instructions here, if the jury concluded that defendant killed Davis in imperfect self-defense it would have returned a verdict of voluntary manslaughter. Defendant observes that the jury could have found that he did not intend to kill Davis, and acted only with implied malice. But such a finding would not have reduced the crime to involuntary manslaughter under pre-Blakeley law without the additional finding that he acted in unreasonable self-defense -- a finding the jury declined to make.

(Ex. E at 12-13.)

Even though the version of CALJIC No. 8.40 given by the trial court was erroneous under California law at the time of trial, this Court must determine whether such error was harmless for federal habeas purposes. See Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (per curiam ) (holding when jury is instructed on multiple theories of guilt, one of which is improper, harmless error standard of review governs). An error is considered harmless if the court can say with reasonable assurance that the error did not have "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quotation and citation omitted).

Here, as the state court found, the jury necessarily rejected Petitioner's claim of imperfect self-defense under the other instructions that were properly given. (Ex. E at 13.) In particular, as discussed above, the jurors were instructed with CALJIC No. 5.17, which expressly advised them that, if they found Davis was killed in the exercise of unreasonable self-defense, they must find that malice was lacking and the killing was not murder. Consequently, had the jury concluded that Petitioner shot Davis in unreasonable self-defense, it would have convicted him of voluntary manslaughter. But, as noted by the state court, the jury declined to make that finding and, instead, found Petitioner guilty of second degree murder, demonstrating that it did not believe the killing was committed in self-defense.

16

United States District Court

For the Northern District of California

1    Thus, even if the trial court had properly instructed the jury with the pre-<u>Blakeley</u> version of

2    CALJIC No. 8.40, there is no reasonable probability that the jury would have found that

3    Davis's killing constituted involuntary manslaughter.

4        Moreover, as the state appellate court observed, even if the jury found that Petitioner

5    acted with implied malice, i.e., that he intended to use non-lethal force to protect himself and

6    did not intend to kill Davis, this finding alone would not have been sufficient to reduce his

7    murder conviction to involuntary manslaughter because, in order for his use of force to be

8    legally justified, the jury necessarily would have had to find that he had the unreasonable

9    belief he needed to defend himself.  But, again, the jury declined to make that finding.

10   Moreover, the evidence supported a finding that Petitioner did not intend to use non-lethal

11   force.  Specifically, the uncontested evidence showed: Petitioner shot Davis six times --

12   twice in the left side of his abdomen, twice in his upper left arm, once in his left calf, and

13   once in his buttocks; one shot was fired from less than one inch from Davis's body; four of

14   the shots entered the front of Davis's body; and, the shots to Davis's calf and buttocks

15   entered from the rear and traveled upward in his body.  (Ex. E at 5-6.)

16       This Court finds that the California Court of Appeal's rejection of Petitioner's claim

17   was not objectively unreasonable.  Instead, the state appellate court reasonably concluded

18   that the factors outlined above rendered harmless the trial court's erroneous instruction that

19   unreasonable self-defense constituted voluntary manslaughter, rather than involuntary

20   manslaughter.  Because the error did not have a substantial and injurious effect or influence

21   in determining the jury's verdict, Petitioner is not entitled to habeas relief on this claim.

22                              **V. CERTIFICATE OF APPEALABILITY**

23       The federal rules governing habeas cases brought by state prisoners require a district

24   court that denies a habeas petition to grant or deny a certificate of appealability in its ruling.

25   <u>See</u> Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. § 2254 (effective December 1,

26   2009).  For the reasons discussed above, Petitioner has not shown "that jurists of reason

27   would find it debatable whether the petition states a valid claim of the denial of a

28   constitutional right [or] that jurists of reason would find it debatable whether the district court

1   was correct in its procedural ruling." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

2   Accordingly, a certificate of appealability is DENIED.

3                                      **VI. CONCLUSION**

4          For the foregoing reasons, the Court DENIES the Petition for Writ of Habeas Corpus as

5   to all claims.  A certificate of appealability will not be issued.  Judgment shall be entered

6   accordingly.

7

8   DATED:  __May 9, 2012__

9                                              JAMES WARE
                                               United States District Judge

**United States District Court**
For the Northern District of California

18